AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

ORIGINAL

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
The premises located at 14500 McNab Avenue, Apartment 2811, Bellflower, CA 90706

Case No. 16-0152M

LODGED
2016 JAN 22 PM 12:00
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

FILED
CLERK, U.S. DISTRICT COURT
JAN 22 2016
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2261A stalking and 18 U.S.C. § 371 (conspiracy to commit interstate stalking) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: ________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Special Agent, Matthew Parker
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-22-16

[signature]
*Judge's signature*

City and state: Los Angeles, California

Frederick F. Mumm, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jeffrey Chemerinsky (X16520) JMC

# ATTACHMENT A

PREMISES TO BE SEARCHED

The premises to be search (the "SUBJECT PREMISES") is located at 14500 McNab Avenue, Apartment 2811, Bellflower, CA 90706.

# ATTACHMENT B

## ITEMS TO BE SEIZED

The items to be seized, listed as follows, constitute fruits, evidence, contraband, and instrumentalities of violations of 18 U.S.C. § 2261A (stalking) and 18 U.S.C. § 371 (conspiracy to commit stalking), occurring between July 1, 2015 and January 9, 2016, namely:

  a. Records of communications relating to ongoing surveillance of Victim #1, Victim #1 family, Victim #1's friends, and Victim #1's family members' friends;

  b. Records of communications regarding instructions to contact, harm, injure, or kill Victim #1, Victim #1 family, Victim #1's friends, and Victim #1's family members' friends;

  c. Records of communications and documents regarding money exchanged;

  d. Records of evidence of photographs of Victim #1, Victim #1's family, Victim #1's friends, and Victim #1's family members' friends;

  e. Records, maps, directions, documents, and programs showing locations or movements of Victim #1, Victim #1's family, Victim #1's friends, and Victim #1's family members' friends;

  f. Evidence of weapons possessed;

  g. Evidence of additional conspirators and their identities;

  h. Evidence of locations of Carlos Rubio-Parra, Alfredo Ramirez-Saldana and Blanca Carolina Diaz during the relevant time period;

  i. Evidence of intent to harm, harass, injure, or intimidate Victim #1, Victim #1 family, Victim #1's friends, and Victim #1's family member's friends.

# AFFIDAVIT

I, Matthew Parker, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation (the "FBI"), and have been so employed since June 2001. I have been assigned to several types of squads over the course of my career including squads responsible for the investigation of organized crime groups and violent gangs. I am currently assigned to the Violent Crimes Squad and the Long Beach Resident Agency ("LBRA"). As a SA, I have participated in numerous federal and state investigations involving violent crimes, to include but not limited to extortion, kidnapping, murder, and murder for hire. Through my participation in these investigations, I have debriefed numerous defendants, confidential informants, cooperating sources, and witnesses with personal knowledge regarding various violent crime violations. I have conducted hundreds of hours of surveillance in support of my investigations. I have also utilized global positioning system ("GPS") tracking devices in support of these surveillance investigations. I am familiar with the installation and operation of GPS tracking devices in how they relate to surveillance activity.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of an application for a warrant to search the residence located 14500 McNab Avenue Apartment 2811, Bellflower, CA 90706 (the "SUBJECT LOCATION").

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is submitted solely for the purpose of establishing probable cause and does not purport to set forth all of my knowledge of, or investigation into, the offense. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PREMISES TO BE SEARCHED

4. The premises to be searched is located at 14500 McNab Avenue, Apartment 2811, Bellflower, CA 90706.

## IV. SUMMARY OF PROBABLE CAUSE

5. As set forth below, criminal complaints have been filed against defendant ALFREDO RAMIREZ-SALDANA ("SALDANA") and BLANCA CAROLINA DIAZ ("DIAZ") for interstate stalking, in violation of 18 U.S.C. 2261A(1). The complaints allege and set forth facts showing that RAMIREZ-SALDANA and DIAZ were working on behalf of Carlos Rubio-Parra ("Rubio-Parra"), a Guatemalan-based drug distributor, to track the locations and movements of Rubio-Parra's ex-wife (Victim #1) and ex-wife's family and friends. Through the use of wiretaps, the investigation revealed that RAMIREZ-SALDANA communicated extensively with Rubio-Parra regarding this surveillance. In addition, the investigation revealed that RAMIREZ-SALDANA and DIAZ utilized sophisticated surveillance tactics such as GPS trackers.

6. SALDANA and DIAZ were also utilizing an apartment unit (i.e, the SUBJECT LOCATION), in the same apartment complex as where Victim #1 and her family lived (located directly across from where the victim family lived), to conduct active surveillance on Victim #1 and her family. Based on statements from DIAZ, it is clear the SUBJECT LOCATION was rented specifically for the purpose of surveilling Victim #1 and her family.

## V. STATEMENT OF PROBABLE CAUSE

### A. Background Leading to the Arrest of RAMIREZ-SALDANA

#### 1. Background

7. Since December 12, 2015, I have been in contact with SAs from the Drug Enforcement Agency ("DEA") regarding their investigation of Carlos Rubio-Parra and ALFREDO RAMIREZ-SALDANA. I have learned from DEA SAs in New York and Chicago, that Rubio-Parra is a high-level narcotics trafficker based out of Central America. On October 29, 2012, Guatemala issued an Interpol "Red Notice" for Rubio-Parra. According to the Red

Notice, from July 10, 2010, to September 28, 2012, Rubio-Parra was the leader of a violent criminal organization. Rubio-Parra is credited with the murder and attempted murder of at least fifteen men and women. According to news reports, at least some of the victims of these murders and attempted murders were associates of Rubio-Parra'S ex-wife.

8. I have learned from DEA SAs that RAMIREZ-SALDANA, also known as "Tony," is acting under the instruction of Rubio-Parra. On a 2014 United States Visa Application, RAMIREZ-SALDANA listed the occupation of Police Officer and an employer of Secretaria Seguridad Publica San Pedro Tlaquepaque, which I interpret to mean that he is a Mexican police officer. Based on conversations and text messages intercepted in the last few months pursuant to a federal wiretap, Rubio-Parra was directing RAMIREZ-SALDANA to conduct active surveillance in the Los Angeles area on Victim # 1 and six additional victims who are associated with Victim # 1.

9. I have interviewed Victim # 1 regarding Rubio-Parra and RAMIREZ-SALDANA. Until informed by law enforcement, Victim # 1 was unaware of the identity and actions of RAMIREZ-SALDANA. In mid-December 2015, based on information learned from intercepted telephone conversations and text messages discussed above, the DEA informed Victim # 1 of RAMIREZ-SALDANA and Rubio-Parra's conversation and their actions taken to secretly track the activities of Victim # 1 and her associates. Based on the information learned from the intercepted telephone conversations between RAMIREZ-SALDANA and Rubio-Parra, Victim # 1 and her associates have been placed in a safe location that is not associated with her residence at the Sherwood Apartments in Bellflower, California. Victim # 1 was a witness related to criminal charges against Rubio-Parra in Guatemala. Based on her previous experiences with Rubio-Parra, Victim # 1 is in fear for her life. The stalking actions taken by RAMIREZ-SALDANA and Rubio-Parra are causing her great emotional stress and have caused her to remain in fear for her life and the safety of those associated with her.

10. I have interviewed the associates of Victim # 1. The stalking actions taken by RAMIREZ-SALDANA and Rubio-Parra are causing the associates of Victim # 1 great emotional stress and have caused them to remain in fear for their lives.

11. On January 9, 2016, I swore out a criminal complaint affidavit before Hon. Patrick J. Walsh against RAMIREZ-SALDANA alleging a violation of 18 U.S.C. § 2261A(1) (stalking). On that same date, RAMIREZ-SALDANA appeared for his initial appearance before Judge Walsh and was ordered detained. On January 19, 2016, I swore out a criminal complaint affidavit before Hon. Frederick F. Mumm against DIAZ, alleging a violation of 18 U.S.C. § 2261A(1) (stalking). On that same date, DIAZ appeared for her initial appearance before Judge Mumm and was ordered detained.

2. RAMIREZ-SALDANA Travels to Los Angeles

12. Based on information I learned from the DEA wiretap investigation, and my own surveillance in the Central District of California, from November 2015 through the present, RAMIREZ-SALDANA has traveled from Mexico to Los Angeles, California on at least two recent occasions to conduct surveillance on Victim # 1 and six additional victims associated with Victim # 1.

13. DEA Chicago provided me with summaries of intercepted telephone conversations and text messages that show RAMIREZ-SALDANA is being directed by Rubio-Parra, which show the following:

a. Rubio-Parra instructed RAMIREZ-SALDANA to locate and follow Victim # 1 and her associates. RAMIREZ-SALDANA's surveillance has included stationary and mobile surveillance of all seven victims.

b. During the conversation, Rubio-Parra instructs RAMIREZ-SALDANA on the purchase, installation, removal, and operation of the GPS tracking devices. RAMIREZ-SALDANA and Rubio-Parra also discuss being cautious in the installation and removal of the GPS tracking devices.

  c. Rubio-Parra advises RAMIREZ-SALDANA to not get caught being recorded by any surveillance cameras.

d. On a December 10, 2015 wiretap call, RAMIREZ-SALDANA reports that he got nervous after someone knocked on the door of his apartment (the apartment directly across from Victim #1's apartment). Rubio-Parra asks what he has inside the apartment and RAMIREZ-SALDANA responds that he has the GPS and some money. RAMIREZ-SALDANA says he also has some pages from the account. Rubio-Parra tells RAMIREZ-SALDANA to hide them in either the gas stove or the fridge.

e. Conversations also coincide with active surveillance being conducted by RAMIREZ-SALDANA.

f. During the conversation, RAMIREZ-SALDANA reports to Rubio-Parra that he was currently watching the vehicle of Victim #1. RAMIREZ-SALDANA took photographs of Victim # 1's vehicle and forwarded the photographs to Rubio-Parra.

14. I accessed a government database that documents international traveler entry into the United States, and learned that on January 3, 2016, RAMIREZ-SALDANA traveled from Mexico to Los Angeles, California. I believe that the purpose of RAMIREZ-SALDANA's travel was to search for Victim #1 and her associates.

15. Beginning on January 3, 2016, through January 9, 2016, I coordinated investigation and surveillance of RAMIREZ-SALDANA and his associates in their attempts to locate Victim # 1 and her associates.

16. Along with other law enforcement personnel, I observed RAMIREZ-SALDANA arrive at Los Angeles International Airport ("LAX") on January 3, 2016. I was informed by SA David Gates that RAMIREZ-SALDANA was selected for a secondary search by a United States Customs Officer. RAMIREZ-SALDANA stated that the purpose of his travel to the United States was to purchase baby clothing for his wife, who was eight months pregnant.

17. RAMIREZ-SALDANA then rented a vehicle from a rental car agency near LAX. RAMIREZ-SALDANA drove to the Baymont Inn and Suites in Lawndale, California. As

discussed below, it was later learned that RAMIREZ-SALDANA met with BLANCA CAROLINA DIAZ in this hotel to retrieve GPS tracking devices.

18.     I observed RAMIREZ-SALDANA depart the Baymont Inn and Suites and travel to the Sherwood Apartments in Bellflower, California (where Victim #1 previously resided). RAMIREZ-SALDANA was seen driving around the gated apartment property several times before entering the property. RAMIREZ-SALDANA exited the property and departed the area at a high speed.

        3.     Tracking Devices

19.     Based on information provided by the DEA in Chicago and my own personal experience, I know that RAMIREZ-SALDANA and others have used several GPS tracking devices to track Victim # 1 and her associates.

20.     On January 6, 2016, FBI SAs conducted a search of the exterior of Victim # 1's vehicle. A GPS tracking device was discovered on the underside of Victim # 1's vehicle. The device was labeled Silver Cloud TAG Serial Number 8880422728.

21.     On January 7, 2016, FBI SAs conducted a search of the exterior of a vehicle of an individual who is only loosely associated with Victim # 1. A GPS tracking device was discovered on the underside of that vehicle. The device was labeled Silver Cloud TAG Serial Number 8880422727.

22.     I conducted an internet search to determine the type of GPS devices that were discovered. The GPS devices are part of a system owned and operated by a company named LandAirSea that is based out of Woodstock, Illinois. I have sent subpoenas to LandAirSea and have learned that the Contact/Activation Information of the account is listed as VALENTINA PARADA. The account listed three Silver Cloud TAG GPS tracking devices that were active for this account. The serial numbers for the GPS tracking devices were listed as follows: 8880422670, 8880422727, and 8880422728.

23.     LandAirSea also provided tracking logs for the account. From the subpoenas to the company and based on the recovery of previously described items, I learned that RAMIREZ-

SALDANA and Rubio-Parra used a website owned and operated by LandAirSea to track the location and movement of the victims.

24. Through my investigation I learned that RAMIREZ-SALDANA surreptitiously installed tracking devices on two vehicles that belonged to the victims. RAMIREZ-SALDANA used the GPS software to follow and locate the vehicles. I inspected two vehicles, including Victim #1's vehicle, and discovered the LandAirSea GPS devices that had been secreted on the underside of the vehicles. The GPS tracking devices were placed in weatherproof magnetic cases and installed on the exterior of the vehicles.

25. Based on information provided by the DEA in Chicago and my own personal experience, I know that RAMIREZ-SALDANA and Rubio-Parra used the LandAirSea internet based interface of the GPS tracking software to coordinate RAMIREZ-SALDANA's surveillance of the victims. RAMIREZ-SALDANA conducted surveillance of the victims all hours of the day and night. Surveillance locations included, but were not limited to, the Victims' residences and places of employment.

4. Recent Surveillance

26. Along with other law enforcement personnel, I observed RAMIREZ-SALDANA conduct several surveillance operations during the week of January 4, 2016, to check on the location of the vehicles on which the tracking devices had been placed. Based on information I learned from DEA telephone intercepted conversations, I know that RAMIREZ-SALDANA was using this in an effort to locate Victim # 1 and her associates.

27. To determine if RAMIREZ-SALDANA was following the vehicles, I obtained Victim #1's permission to move the vehicles around Los Angeles. On January 9, 2016, I placed Victim #1's vehicle at the Sea Bright Hotel, which is located in a secluded part of Long Beach, California. At approximately 4:55 p.m., RAMIREZ-SALDANA, arrived in the vicinity of the Sea Bright Hotel, driving a red Volkswagen Jetta. I saw RAMIREZ-SALDANA arrive at the location of Victim # 1's vehicle. I believe that he was only able to locate the vehicle because he was utilizing the GPS device, that was affixed to the vehicle, especially since the location of the

vehicle had no relationship to prior locations used by the Victims. At approximately 5:12 p.m., RAMIREZ-SALDANA exited the Jetta and entered the passenger side of a white Hyundai. I saw the Hyundai enter the parking lot of the Sea Bright Hotel. As the white Hyundai was exiting the parking lot of the Sea Bright Hotel, Police Officers of the Long Beach Police Department stopped the white Hyundai and took RAMIREZ-SALDANA and the female driver of the Hyundai into custody.

28. Based on my training and experience, I know that individuals who are involved in these types of surveillance operations are doing so because they want to learn a pattern of life of the victims. The individuals will use this surveillance information to find an opportunity to cause stress, intimidation, or physical harm to the victims.

29. Based on the fact that Rubio-Parra is believed to have ordered the murders of individuals associated with Victim #1 in the past, I believe his actions taken to conduct surveillance of Victim #1 and her associates is for the purpose of either harassing, intimidating, or possibly injuring Victim #1 or her associates.

**B. DIAZ's Statements**

1. <u>Interview on January 9, 2016</u>

30. On January 9, 2016, I subsequently interviewed the female driver of the white Hyundai, who was identified as BLANCA CAROLINA DIAZ. DIAZ, while in the custody of the Long Beach Police Department, was advised of her *Miranda* rights. DIAZ stated that she understood her rights and agreed to waive her rights and answer questions. During this interview stated the following:

a. She was instructed by David Monzon Rubio-Parra ("Monzon"), who is Rubio-Parra's nephew, and RAMIREZ-SALDANA to manage the GPS tracking devices, live monitor the GPS trackers, and take notes on the various locations, individuals, and vehicles that RAMIREZ-SALDANA was surveilling.

b. She maintained detailed notes in a folder, which she provided to me. The folder contained photographs, addresses, and information about the victim, their residences, and

their vehicles. The photographs in DIAZ's possession were surreptitiously taken by RAMIREZ-SALDANA at the Sherwood Apartments in Bellflower, California (the residence of Victim #1).

      c.      DIAZ stated that, in early December 2015, at the direction of RAMIREZ-SALDANA, Rubio-Parra, and Monzon, DIAZ purchased approximately five GPS trackers from a business named The Spy Shop in Sherman Oaks, California.

      d.      I showed DIAZ a California Department of Motor Vehicles photograph of Elvin Ricardo Rivas. DIAZ identified the person in the photograph as "Elvin." DIAZ stated that RAMIREZ-SALDANA and RIVAS rented the SUBJECT LOCATION at the Sherwood Apartments, Bellflower, California (the community in which Victim # 1 previously resided) for the purpose of watching the Victim's apartment. DIAZ had visited the SUBJECT LOCATION rented by RAMIREZ-SALDANA in mid-December 2015. RAMIREZ-SALDANA showed DIAZ how he was able to watch the Victim's apartment from the SUBJECT LOCATION. RAMIREZ-SALDANA informed DIAZ that the reason that the SUBJECT LOCATION had been rented was to watch the Victims.

31.      On January 13, 2016 I interviewed DIAZ after she had been released from state custody. During this interview, I learned the following:

      a.      In July 2015, Monzon and Rubio-Parra asked DIAZ to assist them in finding the Victims after the Victims were located in Lomita, California. The Victims were quickly "lost" again but were located by Rubio-Parra in Fall 2015. In October 2015, under the instruction of Rubio-Parra, DIAZ worked with RIVAS to rent the SUBJECT LOCATION in the same complex as the Victims. Two apartments had been available at the time DIAZ was attempting to rent an apartment, but Rubio-Parra had asked DIAZ to rent an apartment near the Victims.

      b.      DIAZ has regular communication with Rubio-Parra, Monzon, and RAMIREZ-SALDANA using a Blackberry application on her phone. Monzon is named "Cabe," Rubio-Parra is named "John Smith," and RAMIREZ-SALDANA is named "Tony" in her

Blackberry contacts. These names were selected by Monzon, Rubio-Parra, and RAMIREZ-SALDANA, not by DIAZ.

  c. DIAZ set up an account with the GPS company LandAirSea for three of the GPS trackers she purchased in December 2015. The account was named "Valentina Parada" with username ValentinaParada2015, which DIAZ had selected. Rubio-Parra and Monzon had told DIAZ not to use her true name when activating the GPS trackers with LandAirSea. DIAZ pays for the account with prepaid credit cards using cash that RAMIREZ-SALDANA provided her. DIAZ only uses her iPhone for monitoring the trackers and regularly monitors these GPS trackers, using the SilverCloud application.[1] The SilverCloud application is LandAirSea's mobile application.

  d. DIAZ was aware of another account of GPS trackers that either Monzon or RAMIREZ-SALDANA had set up with LandAirSea named "Mario Lopez." The username was MarioLopez2608. There were approximately four GPS trackers associated with this account. This account was inactive as DIAZ had not recently paid for the account. The "Mario Lopez" account had previously been monitored using the SilverCloud application on a separate iPhone from the "Valentina Parada" account.

  e. In December 2015, RAMIREZ-SALDANA provided DIAZ $20,000, which DIAZ was to pass to Monzon and keep $3,000 for herself. The money was for Monzon to pay for expenses while Monzon and several other Rubio-Parra's family members were in Los Angeles in mid-December 2015. Monzon and Rubio-Parra had also given DIAZ money to assist DIAZ with her medical treatments.

  f. On Saturday, January 9, 2016, Rubio-Parra texted DIAZ and asked her to check the location of Victim # 1's vehicle, which was then located at the Sea Bright hotel in Long Beach. DIAZ explained that Rubio-Parra also had the log-ins and passwords to the GPS

---

[1] DIAZ provided consent to search her phones. The search of her iPhone revealed the SilverCloud application downloaded on the phone.

accounts. DIAZ texted RAMIREZ-SALDANA the location of the hotel and drove to the hotel to meet RAMIREZ-SALDANA there. Once RAMIREZ-SALDANA arrived, RAMIREZ-SALDANA entered the passenger side of DIAZ's vehicle and told DIAZ to drive into the hotel parking lot to check for Victim # 1's vehicle. As they were exiting the hotel parking lot, RAMIREZ-SALDANA saw the police and began to "freak out."

**C. Probable Cause to Search the SUBJECT LOCATION**

32. As mentioned above, the SUBJECT LOCATION is located directly across where the victim family resided. DIAZ stated that it was rented for the specific purpose of watching the victim family and their movements.

33. In addition, wiretap communications that I have reviewed make clear that RAMIREZ-SALDANA was inside the SUBJECT LOCATION at various points. In addition, movements from the GPS tracker that was often kept on RAMIREZ-SALDANA shows that he frequently visited the SUBJECT LOCATION.[2]

34. FBI obtained a copy of the lease for the SUBJECT LOCATION. The lease is signed by two individuals, Elvin and Cecil Ramirez.

35. Based on the wiretap conversations, it is clear that members RAMIREZ-SALDANA used his cell phone to communicate with Rubio-Parra during his surveillance of the Victims. The wiretaps show that RAMIREZ-SALDANA used his cell phone to send text messages and photographs to Rubio-Parra. Thus, the search of these digital devices may further reveal communications between RAMIREZ-SALDANA and RUBIO PARRA, as well as with other members of the conspiracy.

---

2

## VI. CONCLUSION

36. For all the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. § 2261A(1) (stalking) and 18 U.S.C. § 371 (conspiracy to commit stalking), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT LOCATION, as further described above and in Attachment A of this affidavit.

Matthew Parker, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 22nd day of January, 2016.

HONORABLE FREDERICK F. MUMM
UNITED STATES MAGISTRATE JUDGE